E4MDDMIXC

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x
 3   MYRON MIXON and JACK'S OLD
     SOUTH, LLC,
 4
                   Plaintiffs,
 5
            v.                          13 CV 5534(JGK)
 6
     PRIDE AND JOY MIAMI, LLC d/b/a
 7   PRIDE & JOY, LLC, PRIDE AND
     JOY BBQ, LLC d/b/a PRIDE &
 8   JOY, LLC and PABLO CARDENAS,
 9                 Defendants.
10   ------------------------------x
                                        New York, N.Y.
11                                      April 22, 2014
                                        2:45 p.m.
12
     Before:
13
                         HON. JOHN G. KOELTL,
14
                                            District Judge
15
                           APPEARANCES
16
     MERLE, BROWN & NAKAMURA, P.C.
17        Attorneys for Plaintiffs
     BY:  STEPHEN H. NAKAMURA
18        ANDREW R. PECK
19   WILMER CUTLER PICKERING HALE AND DORR LLP
          Attorneys for Defendants
20   BY:  PETER J. MACDONALD
          CRAIG R. HEEREN
21
22
23
24
25
```

E4MDDMIXC

```
 1          (Case called)

 2          MR. MACDONALD:  Good afternoon, your Honor, Peter

 3   Macdonald from WilmerHale for the defendants.

 4          MR. HEEREN:  Craig Heeren from WilmerHale for the

 5   defendants.

 6          MR. NAKAMURA:  Stephen Nakamura for the plaintiffs.

 7          MR. PECK:  Andrew Peck for the plaintiffs.

 8          THE COURT:  All right.  Good afternoon, all.

 9          MR. MACDONALD:  Good afternoon.

10          MR. NAKAMURA:  Good afternoon.

11          THE COURT:  This is a motion to dismiss.  I should

12   point out, I probably told you this before, I know people at

13   WilmerHale personally, professionally.  One of my former law

14   clerks was a partner there.  Nothing about that affects

15   anything I do in the case.  I don't believe I know any of the

16   lawyers here.  All right.

17          Motion to dismiss.  I'm familiar with the papers.

18   I'll listen to arguments.

19          MR. MACDONALD:  Thank you, your Honor.  Peter

20   Macdonald for the defendants.

21          I would like to divide up the argument, I will address

22   the issues of the motion to dismiss the contract claims, and my

23   colleague Craig Heeren will address the trademark and

24   misappropriation of name claims, to the extent your Honor has

25   questions about those.
```

E4MDDMIXC

```
 1              THE COURT:  How much time do you want?

 2              MR. MACDONALD:  I will be at the Court's mercy in

 3    terms of time.

 4              THE COURT:  About 10 minutes.

 5              MR. MACDONALD:  Thank you.  I'll be brief.

 6         I would just like to start, your Honor, by addressing,

 7    and maybe entering the discussion with two cases, Braun and

 8    Bouton.  I know you're familiar with the Bouton case.

 9         I think those cases are interesting and illuminating

10    here, because in both those cases you had situations where

11    there was partial performance in the Braun case for an extended

12    period of time.  In both of those cases, once the record was

13    established, the Court was dispositive in addressing the

14    claims.

15              THE COURT:  But it was only after many more

16    proceedings.  Bouton was after trial.

17              MR. MACDONALD:  Yes, but I think once the operative

18    facts were determined, in Bouton obviously by a trial, in Braun

19    by summary judgment record, but the principles that were

20    established apply here and on the pleadings are comparable.

21    And there are certainly numerous cases that have been disposed

22    of on 12(b)(6) grounds, which we cite: the Anostario case, the

23    Ixe Banco case, Kleinberg, Laruffa, National Gear.  There are

24    others that I think the only distinction was it took some time

25    because there were disputes.
```

E4MDDMIXC

```
 1              Usually it's because it was an oral agreement, or an
 2     alleged oral agreement.  And I think that's what is distinctive
 3     about this case, is that this is not a case where you have the
 4     classic situation where you have an agreement that says there
 5     are no oral modifications and the parties allege that there
 6     were some oral discussions that constitute the basis for the
 7     modification.
 8              In this case there's no allegation of any oral
 9     communication.  The record is established simply in the context
10     of the draft document and some text messages.
11              THE COURT:  There are plainly substantial allegations
12     of partial performance inextricably intertwined with the new
13     agreement.
14              MR. MACDONALD:  Well, inextricably --
15              THE COURT:  Plainly referable to the new agreement.
16              MR. MACDONALD:  Well, that's a fair characterization,
17     but not exclusively referable.  And I think that's a critical
18     distinction.
19              The courts make it very clear that if it's referable
20     to both the initial agreement and the purported amended
21     agreement, that is not going to do it for the claim, because it
22     has to be exclusively referable.
23              THE COURT:  But here certainly, for purposes of a
24     motion to dismiss, it appears to be exclusively referable to
25     the new agreement.  The $50,000 was more than was owed under
```

E4MDDMIXC

1    the other agreement and was precisely what was owed under the

2    new agreement.  And the parties seem to act as though the new

3    agreement were in force, in terms of using the name and doing

4    all of the proceedings in New York as though they had the right

5    to use the name in New York, which they didn't have, other than

6    if there were a new agreement.

7              MR. MACDONALD:  Well, I think the response to that,

8    your Honor, is that the conduct that they were engaging in --

9    and I would direct the Court to Anostario, the Merrill Lynch

10   case, and the Rose v. Spa case, because I think those all go

11   directly to your Honor's question, which is when the conduct is

12   referable to both the existing agreement, which it was here.

13             He was owed money under the original agreement.

14             THE COURT:  He was owed, what, 32,000 under the old

15   agreement?  And now he's paid --

16             MR. MACDONALD:  And five weeks later would be owed

17   50,000, because the next $18,000 payment would be due.

18             THE COURT:  But he's paid before he's otherwise due

19   that, and precisely what he's due under the new agreement.

20             MR. MACDONALD:  And that's true, and it's consistent

21   with the parties working towards a new agreement.  But that

22   doesn't get you out from the exception under 15-301.  I think

23   the cases are very clear that when the parties are doing things

24   that are preparatory to a new agreement -- I think the *Merrill*

25   *Lynch* case from the Second Circuit is very instructive on that

E4MDDMIXC

point because it is exactly that situation.  The parties

executed notes obligating themselves to pay amounts in

anticipation of a closing.  It didn't happen, and they

attempted to bring the claim as an oral modification of an

existing agreement.

          And the response of the Court there, it was a

dispositive motion, was that, is the fact that it is consistent

with working towards a new agreement when the parties have

unambiguously made clear that they're not going to be bound to

a new agreement until they execute a writing is critical.

          And I think that the overwhelming number of cases that

are cited by both sides are cases in which the claim was

dismissed, the contract claim.

          One of the few where it wasn't, the Rose v. Spa case,

is a case where you have significant detrimental reliance, and

the parties did things like built model homes and spent

hundreds of thousands of dollars on work towards a real estate

development.

          And I think Judge Breitel in that case makes it clear

that the detrimental reliance element is very important in

understanding when the rare exception to 15-301 will be

permitted.

          So, I really do think, your Honor, that a fair reading

of those cases demonstrates that when the conduct is consistent

both with preparing a new agreement, and in this case was

1  consistent with the existing agreement, I think that the

2  accounting difference of the amount is not relevant.  And in

3  fact in the claim in this case the plaintiffs have claimed that

4  50,000 is an offset to their claim under the 2012 agreement, if

5  that's the agreement they end up suing on.

6          So, I think it's not a situation where if there's any

7  basis to say it's referable to the new agreement, rather the

8  standard is it has to be exclusively referable, and I think the

9  words that were used are inconceivable absent the new

10 agreement.  And that's not the case here.

11         Mindful of the time, just briefly on the second point

12 I would address with respect to the contract claim, your Honor,

13 is the claim against Pride and Joy New York.

14         That is a claim under a proposed contract, either the

15 2012 or the 2013 agreement, it's not entirely clear, but Pride

16 and Joy New York was not a party to either of those agreements

17 and is not named on the proposed amendment.

18         And in the opposition the plaintiffs cite no case,

19 there's basically two paragraphs where they make an argument,

20 but even that argument is internally inconsistent, and they say

21 the 2013 agreement is either a new agreement or it modified the

22 2012 agreement.  And it can't be both.  And it clearly by its

23 terms purported to be a new agreement.

24         Pride and Joy New York was not a party to the old

25 agreement, and is not even listed as a party to the new

E4MDDMIXC

1    agreement.  So certainly the claims against Pride and Joy

2    New York under the proposed amendment or under the 2012

3    agreement, if the plaintiffs are pursuing that theory, should

4    be dismissed.

5          THE COURT:  What's happening on the ground with the

6    New York restaurant?

7          MR. MACDONALD:  Nothing.  It's dead in the water and

8    has been so for over a year, as far as I know.

9          THE COURT:  No expectation of opening?

10          MR. MACDONALD:  I think there's an expectation at some

11    point of opening.  It will not be a Pride and Joy restaurant.

12    That theme, if you can use that term for a restaurant, is not

13    what's going to be pursued.  It will be an entirely different

14    type of restaurant, and certainly will have no affiliation with

15    Mr. Mixon or use anything remotely approaching his particular

16    brand of cuisine.

17          So, mindful of the time, I would like to cede the dais

18    if I can to my colleague Mr. Heeren to address the trademark

19    claims briefly.

20          THE COURT:  Sure.

21          MR. MACDONALD:  Thank you.

22          THE COURT:  Thank you.

23          MR. HEEREN:  Thank you, and good afternoon, your

24    Honor.

25          Plaintiffs' trademark infringement claims against the

E4MDDMIXC

individual defendant, Mr. Cardenas, they need to allege that he
was an active participant in the infringement, and they have
failed to do so.

The only allegations against Mr. Cardenas are that he
was a controlling member of the PJNY, Pride and Joy New York,
and that he approached Mr. Mixon's agent in 2012.

There's no allegations that Mr. Cardenas directed that
Mr. Mixon's image be used on Facebook, that he specifically
requested that Mr. Mixon attend any pre-opening events.
There's no allegations that Mr. Cardenas was an active
participant in even the negotiations for the 2013 amendment
that they allege.

In fact, in their amended complaint the only
infringing conduct is alleged to be done by Pride and Joy, the
Pride and Joy corporate entities.

The two cases, relevant cases cited here are
instructional.  In both Carell and Bambu Sales, the Court
dismissed some individual defendants and declined to dismiss
others.  In Carell, it was on a motion to dismiss.  The
plaintiff adequately pled claims against one defendant because
they had alleged that the defendant licensed many of the
infringing uses, participated in the infringements, and was
responsible for the misattribution of this makeup design kit
that was related to the musical "Cats," and that this defendant
willfully deprived her of authorship credits.

E4MDDMIXC

1          By contrast, allegations that other defendants had

2    ownership of relevant company, their status as a producer of a

3    Broadway production, and the fact that they're credited on the

4    allegedly infringing video was insufficient.

5          The simple allegation that these defendants

6    "participated in some, if not all," of the infringement is

7    conclusory, as the Court concluded there.  And the same applies

8    here with these allegations.

9          Bambu Sales is no different, it was on a summary

10   judgment motion, but that was pre-Iqbal and Twombly.  And the

11   defendant was dismissed, they did not allege any "wrongful

12   acts."  By contrast, the defendant that remained was a manager

13   who purchased and resold the counterfeit goods.

14         THE COURT:  Do you think Iqbal and Twombly changed the

15   law as to what a plaintiff has to allege?

16         MR. HEEREN:  I think Iqbal and Twombly make it clear

17   that it has to be plausible, not just possible.

18         THE COURT:  Right.  Did it really change the law any?

19         MR. HEEREN:  I think it clarified for the courts that

20   these complaints needed to move the ball beyond just simply

21   asserting the basic elements of facts -- the basic elements of

22   a claim, which is precisely the case here.  So, to answer your

23   question, I don't think it raised the pleading standard, your

24   Honor, it's still a Rule 8 pleading notice, but that is defined

25   by the Court that there's plausible facts alleged.  And I think

E4MDDMIXC

1    those facts are absent here.  There's no facts to indicate

2    there was an active participant; they merely allege she was a

3    passive member of the partnership.

4              And I'd just state very briefly that there's no

5    misappropriation claim under New York law.  The plaintiffs seem

6    to have abandoned that claim.

7              THE COURT:  Well, let me listen in a moment to whether

8    the plaintiff has abandoned it or not.

9              You first raised that argument in a footnote, right?

10             MR. HEEREN:  Yes, your Honor.

11             THE COURT:  Okay.

12             MR. HEEREN:  There's not much case law on it, but the

13   instructive case from 2005 indicates, if you're going to plead

14   that form of claim, it has to be a statutory claim under

15   Section 50 or 51 of the New York Civil Rights Law.

16             If your Honor has no questions, I will --

17             THE COURT:  Okay.  Thank you.

18             MR. HEEREN:  Thank you.

19             MR. NAKAMURA:  Good afternoon, your Honor.  I will try

20   to be brief.

21             THE COURT:  You will be brief.

22             MR. NAKAMURA:  I will be brief.  Yes, sir.

23             On the contract issue and the issue of partial

24   performance, I think what's highlighted here is it's a

25   fact-sensitive inquiry.  And there's two things going on.

E4MDDMIXC

1            One is the conduct was not merely preparatory.  There
2       was the creation of a New York Facebook page.  There was entry
3       into a lease.  There was the payment of the exact $50,000
4       amount.  There was an application filed with the New York State
5       Liquor Authority.

6            As to the identity of the entity on the 2013
7       agreement, it is listed as Pride & Joy, LLC, which as far as we
8       know is a nonexistent entity.  And we've alleged that both the
9       New York entity and the Florida entity conducted business under
10      the name Pride and Joy, as though it were some sort of brand
11      name.

12           With respect to the trademark case, I think again what
13      we're looking at here is a fact-sensitive inquiry.  Is it
14      plausible that Mr. Cardenas, who is alleged to be a controlling
15      owner and managing member of Pride and Joy, directed the
16      infringing activity?

17           Now, in this instance it's not as though we hit them
18      with a suit out of the blue.  We told them in early July by
19      letter, cut it out, stop using Mr. Mixon's name and likeness,
20      because you haven't paid him.

21           We wrote to both Pride and Joy and Mr. Cardenas.  Mr.
22      Cardenas is the controlling owner of the company, and that
23      conduct persisted.

24           I think it's perfectly plausible to suggest that the
25      controlling owner directed the infringing activity of a

E4MDDMIXC

1    five-member limited liability company.

2           THE COURT:  Could I ask what this case is really

3    about?  How much does Mr. Mixon claim that he is really owed,

4    now that the New York restaurant has not taken off, no plans,

5    the defendants say, to pursue the New York restaurant, the deal

6    has plainly fallen apart?  Is the Miami restaurant still

7    operating?

8           MR. NAKAMURA:  Yes, your Honor, it is still operating

9    and, as far as I know, they've opened a second location in the

10    Continental Airlines Arena where the Miami Heat play.

11           THE COURT:  Using Mr. Mixon's name?

12           MR. NAKAMURA:  No.  Using Pride and Joy.  But they

13    still use his name to the extent that he's listed on their

14    Facebook page as the chef and owner.

15           THE COURT:  With respect to the second restaurant or

16    the first?

17           MR. NAKAMURA:  With respect to the first restaurant,

18    Pride and Joy Miami.  Although on that Facebook page they

19    reference their concession stand.

20           I think what this case is really about is that the

21    defendants have paid a front-loaded value using Mr. Mixon's

22    name and likeness.  They paid him a paltry sum of around

23    $40,000, then another 50, and then dumped him, that's what this

24    is about, and then repudiated the agreement.

25           THE COURT:  But even the new agreement doesn't pay him

E4MDDMIXC

1   a huge amount of money.

2           MR. NAKAMURA:  $100,000 per year, your Honor, as

3   opposed to $75,000 per year, and they repudiated that

4   agreement.

5           THE COURT:  And the defendants have stopped paying him

6   at all?

7           MR. NAKAMURA:  Correct.

8           THE COURT:  And this is a partial motion to dismiss,

9   right --

10           MR. NAKAMURA:  Correct.

11           THE COURT:   -- there are some monies that the

12   defendants don't dispute that are owed?

13           MR. NAKAMURA:  Well, I don't know if they dispute

14   whether or not 75,000 a year is owed, but, yes, there still

15   will be a claim, your Honor.

16           THE COURT:  One would have thought that this is the

17   kind of case that should be resolved because the amount that

18   could possibly be dividing the parties is not that great, with

19   the demise of the New York restaurant, with the failure to use

20   Mr. Mixon's name on the second Florida restaurant.  But go

21   ahead.

22           MR. NAKAMURA:  Regarding New York, your Honor --

23           THE COURT:  With respect to the claim for

24   misappropriation of name and likeness, have you abandoned that

25   claim?

E4MDDMIXC

1          MR. NAKAMURA:  No, your Honor, we haven't.  Like your

2     Honor mentioned, it was brought up in a footnote.  We didn't

3     address it, I admit that, in opposing the motion to dismiss.

4          My understanding, and I would have to double-check,

5     but I believe Georgia's misappropriation statute would apply in

6     this instance, where Mr. Mixon resides, as opposed to

7     New York's, but I am not admittedly prepared to talk about that

8     today.

9          One other thing about the New York restaurant, your

10    Honor, is I don't know if they're entirely shut down.  There's

11    an ongoing litigation between Pride and Joy New York and the

12    landlord for that space.  We would probably have to learn from

13    discovery what their intentions are with regard to that

14    restaurant.

15          THE COURT:  Well, they say it's not to use Mr. Mixon

16    in any way in terms of promotion of the New York restaurant.

17          MR. NAKAMURA:  I understand that, and I believe that,

18    your Honor.  I think what's somewhat being lost here is that

19    they obtained all of their value from the use of his name and

20    likeness to launch.  That is where they derive their value

21    from.  There wouldn't be a successful Pride and Joy down in

22    Florida and second concession where the Miami Heat play if it

23    weren't for him getting involved from the get-go.  That was how

24    they started this business, your Honor.

25          THE COURT:  Do you know that the restaurant in Florida

E4MDDMIXC

1    is profitable?

2            MR. NAKAMURA:  Well, Mr. Mixon's agent, Mr. Michael

3    Psaltis, of an entity known as The Cea, did receive up through

4    about February of 2004 --

5            THE COURT:  2014.

6            MR. NAKAMURA:  2014 -- I'm sorry -- gross sales

7    reports for food for the day, which would be anything that was

8    entered into the point-of-sale system, it would exclude drinks.

9            And in speaking with him, my understanding is that it

10   appears that maybe the restaurant is doing on food about 3.5 a

11   year, and that excludes drinks, but I'd have to analyze the

12   statements myself to be able to make a representation about

13   that.

14           THE COURT:  Okay.

15           MR. NAKAMURA:  Thank you, your Honor.

16           THE COURT:  All right.  I'm prepared to decide.

17           The plaintiffs, Myron Mixon and Jack's Old South, LLC

18   (collectively, "plaintiffs"), bring this action for breach of

19   contract, trademark infringement, and common law

20   misappropriation of name and likeness against Pride and Joy

21   Miami, LLC, ("PJM"), Pride and Joy BBQ, LLC, ("PJNY"), and

22   Pablo Cardenas (collectively, the "defendants").  The

23   plaintiffs allege that the defendants are in breach of a 2012

24   agreement pursuant to which Mixon was compensated in exchange

25   for assisting the defendants in opening a Miami restaurant and

E4MDDMIXC

in exchange for allowing the defendants to use his name and

likeness in marketing the Miami restaurant.  The plaintiffs

also allege that the defendants are in breach of an alleged

2013 amendment to the 2012 agreement, and that the defendants

engaged in the unlawful use of Mixon's name and likeness in

promoting a New York restaurant.

        The defendants move to dismiss several of the

plaintiffs' claims pursuant to Federal Rule of Civil Procedure

12(b)(6) for failure to state a claim.  Specifically, the

defendants move to dismiss the plaintiffs' claims for breach of

the alleged 2013 amendment and common law misappropriation of

name and likeness in their entirety, to dismiss the plaintiffs'

claim for breach of the 2012 agreement against defendant PJNY,

and to dismiss the plaintiffs' claim for trademark infringement

against defendant Cardenas.  This Court has jurisdiction

pursuant to 28 U.S.C. Section 1332 based on diversity of

citizenship and the amount in controversy.  The Court also has

jurisdiction over the plaintiffs' Lanham Act trademark claims

pursuant to 28 U.S.C. Sections 1331, 1338(a) and 1338(b), and

supplemental jurisdiction over any state law claims pursuant to

28 U.S.C. Section 1367(a).

        In deciding a motion to dismiss pursuant to Rule

12(b)(6), the allegations in the complaint are accepted as

true, and all reasonable inferences must be drawn in the

plaintiffs' favor.  McCarthy v. Dun & Bradstreet Corp., 482

F.3d 184, 191, (2d Cir. 2007).  The Court's function on a

motion to dismiss is "not to weigh the evidence that might be

presented at trial but merely to determine whether the

complaint itself is logically sufficient."  Goldman v. Belden,

754 F.2d 1059, 1067, (2d Cir. 1985).  A complaint should not be

dismissed if the plaintiffs have stated "enough facts to state

a claim to relief that is plausible on its face."  Bell

Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007).  "A

complaint has facial plausibility when the plaintiff[s] plead

factual content that allows the court to draw the reasonable

inference that the defendant is liable for the misconduct

alleged."  Ashcroft v. Iqbal, 556 U.S. 662, 678, (2009).  While

factual allegations should be construed in the light most

favorable to the plaintiffs, "the tenet that a court must

accept as true all of the allegations contained in a complaint

is inapplicable to legal conclusions."

        The following facts are undisputed or accepted as true

for purposes of the defendants' Motion to Dismiss.

        Myron Mixon is a celebrity chef who specializes in

barbeque and who resides in Georgia.  He makes frequent

appearances on national television, has published a

best-selling cookbook, and has won various culinary

competitions.  Mixon's company, Jack's Old South, LLC, is a

Georgia company with its principal place of business in

Georgia.  Through Jack's Old South, Mixon sells various cooking

products and ingredients, and also operates a cooking school

and catering business.

        Defendant PJM is a Florida company with its principal

place of business in Florida.  Defendant PJNY is a New York

company with its principal place of business in New York.  The

plaintiffs allege that both PJM and PJNY do business as Pride

and Joy, LLC.  Defendant Pablo Cardenas is the managing member

and majority owner of PJM and PJNY, and is a resident of

Florida.

        In or about December 2011 or January 2012, PJM

approached Mixon's agent, Michael Psaltis, about partnering

with Mixon to open a barbeque restaurant in Miami, Florida.

PJM represented that the partnership would be valuable for both

parties because Mixon would be compensated directly and PJM

would leverage Mixon's profile and culinary expertise to

develop a profitable restaurant.

        On March 5, 2012, PJM and Mixon entered into an

agreement called the Myron Mixon/Pride and Joy Restaurant

Partnership Agreement (the "2012 Agreement").  Pursuant to the

2012 agreement, Mixon granted PJM the right to use Mixon's name

and likeness in connection with a Miami Barbeque restaurant to

be called Pride and Joy.  The 2012 agreement also provided that

Mixon would assist PJM in developing the restaurant, such as by

consulting with PJM on matters like food service, the menu, and

other back-of-house operations.  With respect to Mixon's

1   compensation, the 2012 agreement provided that Mixon would

2   receive an upfront payment of $40,000.  Additionally, the 2012

3   agreement provided that Mixon would receive 10 percent of the

4   Miami restaurant's net profits, and receive a $75,000 yearly

5   salary, payable in quarterly installments after the Miami

6   restaurant opened.  Under the 2012 agreement, each party agreed

7   to refrain from opening another barbeque restaurant without

8   first providing the other party to the agreement with an

9   opportunity to participate in the new venture.

10          After executing the 2012 agreement, PJM began to

11  develop and market the Miami restaurant.  In doing so, PJM

12  relied heavily on Mixon's name and likeness, using it in

13  various advertising campaigns, and decorating the Miami

14  restaurant, and in designing the restaurant's menu.  PJM opened

15  the Miami restaurant to the public in October 2012.

16          Although PJM made the $40,000 upfront payment due to

17  Mixon under the 2012 agreement, the plaintiffs allege that PJM

18  did not make the first and second quarterly installments of

19  Mixon's salary under the 2012 agreement on schedule.  Instead

20  of paying the first and second quarterly installments of

21  Mixon's salary, some $37,500, PJM sought to renegotiate the

22  2012 agreement.  Mixon agreed to renegotiate the 2012 agreement

23  and the parties began discussing an amendment to the 2012

24  agreement in or about January 2013.  The plaintiffs maintain

25  that the terms of this alleged amendment (the "2013 Amendment")

1   are memorialized in a letter dated January 18, 2013.

2              According to the plaintiffs, the 2013 agreement

3   required that Mixon waive payment of the $37,500 owed to him

4   under the 2012 agreement, and that Mixon allow PJM to use

5   Mixon's name and likeness in connection with developing and

6   marketing a New York restaurant.  In exchange, PJM would be

7   required to increase Mixon's yearly salary, referred to as his

8   license fee, from $75,000 per year to $100,000 per year.  PJM

9   was to pay Mixon's $100,000 yearly salary in biannual

10  installments of $50,000 due on January 20th and July 1st of

11  each year.  The plaintiffs also contend that the 2013 agreement

12  entitled Mixon to a 10 percent ownership interest in both the

13  Miami and New York restaurants, and to voting rights with

14  respect to each restaurant that were equal to the voting rights

15  of the managing members of each restaurant.  Mixon would

16  continue to receive 10 percent of the net profits from each

17  location.  The 2013 agreement was to be executed between Mixon

18  and an entity called "Pride & Joy, LLC," an umbrella entity

19  that allegedly encompasses both PJM and PJNY.

20              On January 18, 2013 Psaltis, on behalf of Mixon,

21  circulated a draft of the 2013 agreement to members of PJM and

22  PJNY.  By January 23, 2013, two members of PJM and PJNY had

23  approved the amendment.  Additionally, on January 23, 2013, one

24  managing member of PJM and PJNY, Chris Mayer, indicated his

25  agreement and requested wire info for Mixon.  On January 25,

E4MDDMIXC

2013, Psaltis requested that PJM and PJNY wire funds owed to Mixon pursuant to the 2013 agreement.  In response, Mayer stated:  "Yeah, I'm on it," and Mixon received $50,000 by wire transfer that day.

While the parties were negotiating the 2013 amendment, PJNY and PJM began promoting the New York restaurant, to be called Pride and Joy New York BBQ.  In promoting the New York restaurant, PJNY and PJM highlighted the restaurant's association with Mixon.  Specifically, the plaintiffs allege that PJM and PJNY launched a Facebook page exploiting Mixon's name, likeness and trademarks in connection with the New York restaurant.  The defendants held a pre-opening of the New York Restaurant on May 21, 2013.

The defendants did not make the biannual $50,000 payment due to Mixon on July 1, 2013 under the alleged 2013 agreement.  After Mixon demanded payment, the defendants by counsel informed Mixon that they did not believe the 2013 amendment constituted a valid contract and did not intend to perform under the 2012 agreement.

The defendants also maintained that they were not at that juncture using Mixon's name, likeness, or trademarks.

The plaintiffs bring claims predicated on breach of the alleged 2013 agreement, and, alternatively, a breach of the 2012 agreement.  The plaintiffs also bring claims for trademark infringement and common law misappropriation of name and

E4MDDMIXC

likeness.

         The defendants contend that the plaintiffs' claims for breach of the 2013 agreement should be dismissed because the 2013 amendment was a preliminary, unsigned, and therefore nonbinding agreement.  The plaintiffs contend the parties objectively manifested their intent to be bound by the 2013 amendment.

         The parties agree that their intent to be bound by the 2013 amendment is governed by New York law.  See, e.g., Powe v. Cambium Learning Co., No. 08 Civ. 1963, 2009 WL 2001440, at 4 (S.D.N.Y. July 9, 2009).  See also RLI Insurance Co. v. Conseco, 543 F.3d 384, 390 (7th Cir. 2008), ("When neither party raises a conflict of law issue in a diversity case, the applicable law is that of the state in which the federal court sits.")

         "Under New York law, if the parties do not intend to be bound by an agreement until it is in writing and signed, then there is no contract until that event occurs." R.G. Group Inc. v. Horn & Hardart Co., 751 F.2d 69, 74 (2d. Cir. 1984) (citing Scheck v. Francis, 260 N.E.2d 493, 493 (N.Y. 1970)). However, "parties are free to enter into a binding contract without memorializing their agreement in a fully executed document." Winston v. Mediafare Corp. 777 F.2d 78, 80 (2d. Cir. 1985).  "What matters are the parties' expressed intentions, the words and deeds which constitute objective

1   signs [of whether the parties intend to be bound] in a given

2   set of circumstances." R.G. Group, 751 F.2d at 74.

3           In determining whether parties have manifested their

4   intent to be bound by an unsigned agreement, courts consider

5   the following factors:

6           (1) whether there has been an express reservation of

7   the right not to be bound in the absence of a writing;

8           (2) whether there has been partial performance of the

9   contract; (3) whether all of the terms of the alleged contract

10  have been agreed upon; and (4), whether the agreement at issue

11  is the type of contract that is usually committed to writing.

12          Winston, 777 F.2d at 80; see also CAC Group Inc. v.

13  Maxim Group LLC, 523 F. App'x 802, 803-04 (2d. Cir. 2013)

14  (summary order).  It is well settled that none of the four

15  Winston factors is dispositive; "rather, all four factors

16  should be considered for their bearing on the parties' intent

17  in the context of the entire case." Langreich v. Gruenbaum,

18  775 F. Supp. 2d 630, 636 (S.D.N.Y. 2011); see also, e.g.,

19  Ciaramella v. Reader's Digest Association, Inc., 131 F.3d 320,

20  323 (2d. Cir. 1997).  While courts can determine whether

21  parties intend to be bound by an unexecuted agreement on a

22  motion to dismiss, it is often prudent to exercise caution in

23  deciding whether an agreement is binding before the parties

24  have had an opportunity to submit evidence of their intent.

25  See, e.g., AEP-PRI Inc. v. Galtronics Corp. Ltd., No. 12 Civ.

1   8981, 2013 WL 4400833, at 7, (S.D.N.Y. August 13, 2013).

2           The defendants argue that the plaintiffs' claims for

3   breach of the 2013 amendment should be dismissed because the

4   parties expressly provided in the 2012 agreement that there

5   were to be no amendments except with the prior written consent

6   of both parties.  The 2013 amendment provides a block for the

7   parties' signatures; however, the plaintiffs concede that the

8   contracting parties never signed the 2013 amendment.

9           Although an express reservation of the right not to be

10  bound in the absence of a signed writing is entitled to

11  considerable weight in determining whether parties intended to

12  be bound by an unexecuted agreement, the Second Circuit Court

13  of Appeals has explained that no Winston factor is dispositive,

14  and that each is entitled to weight.  See, e.g., Ciaramella,

15  131 F.3d at 323-24.  While the Court of Appeals has instructed

16  that mere negotiation or oral agreement may be insufficient to

17  overcome an explicit reservation of the intent not to be bound

18  without a signed writing, see, e.g., R.G. Group, 751 F.2d at

19  74, the plaintiffs have alleged more than mere negotiation or

20  preliminary agreement.  In particular, the plaintiffs have

21  alleged that the defendants partially performed the 2013

22  amendment.

23          Partial performance is a factor of "major

24  significance" in determining whether parties intend to be bound

25  by an unexecuted contract.  R.G. Group, 751 F.2d at 75.

E4MDDMIXC

Indeed, the Second Circuit Court of Appeals instructs that "partial performance is an unmistakable signal that [the performing party] believes there is a contract." <u>Id</u>. at 75-76; <u>see also, e.g.</u>, <u>V'soske v. Barwick</u>, 404 F.2d 495, 499-500 (2d Cir. 1968) (partial performance "strongly indicates that the parties thought they had a binding contract").

In this case, the plaintiffs allege that the defendants partially performed the alleged 2013 agreement in two ways:  First, by tendering payment under the 2013 amendment, and, second, by using Mixon's name and likeness in promoting the New York restaurant.  With respect to payment, the Amended Complaint alleges that on January 23, 2013, the defendants requested Mixon wire information so that the defendants could tender payment to Mixon pursuant to the 2013 amendment.  The Amended Complaint also alleges that, on January 25, 2013, Psaltis requested that the defendants pay Mixon pursuant to the 2013 amendment.  In response to Psaltis, the defendants allegedly indicated they would make the requested payment.  The defendants ultimately paid Mixon $50,000 on January 25, 2013.  The defendants' willingness to make the $50,000 payment is plainly consistent with an intent to be bound by the 2013 amendment, because the amount tendered is precisely that amount owed under the 2013 amendment, and because absent an intent to be bound by the 2013 amendment, the defendants owed Mixon only $37,500 at the time they tendered

E4MDDMIXC

the payment.

With respect to the use of Mixon's name and likeness, the Amended Complaint alleges that on January 22, 2013, the defendants launched a Facebook page that promoted the New York restaurant by emphasizing Mixon's involvement.  Moreover, the Amended Complaint alleges that the defendants conducted an aggressive marketing campaign that promoted the New York restaurant by highlighting the restaurant's association with Mixon.  The defendants' use of Mixon's name and likeness in connection with the New York restaurant strongly indicates that the defendants intended to be bound by the 2013 amendment because the defendants had no authorization to use Mixon's name and likeness in connection with the New York restaurant under the parties' prior agreement.  Accordingly, the plaintiffs have alleged considerable partial performance with respect to the 2013 amendment.

In light of such considerable allegations of partial performance, the Court cannot at this stage in the litigation conclude the 2013 amendment was only a preliminary and nonbinding agreement.  Indeed, several of the authorities upon which the defendants rely only determined the issue of intent on a motion for summary judgment or at trial.  See, e.g., Jim Bouton Corp. v. William Wrigley, Jr. Co., 902 F.2d 1074, 1075 (2d Cir. 1990); Arcadian Phosphates v. Arcadian Corp., 884 F.2d 69, 73 (2d Cir. 1989); Braun v. CMGI, Inc., No. 99 Civ. 12328,

1    2001 WL 921170, at 1 (S.D.N.Y. August 14, 2001).

2            The defendants argue that, even if the plaintiffs'

3    claims for breach of the alleged 2013 amendment cannot be

4    dismissed under the Winston test, the claims for breach of the

5    2013 amendment should be dismissed because New York General

6    Obligation Law prevents parties from modifying any prior

7    agreement that precludes oral modifications without a signed

8    writing.  See N.Y. General Obligation Law Section 15-301.  The

9    plaintiffs respond that their claims should survive under the

10   partial performance exception to Section 15-301.

11           Under New York law, the partial performance exception

12   to Section 15-301 applies if two conditions are satisfied.

13   First, the partial performance must be "unequivocally

14   referable" to the alleged modification.  See, e.g., Merrill

15   Lynch Interfunding, Inc. v. Argenti, 155 F.3d 113, 122 (2d Cir.

16   1998); Rose v. Spa Realty Associates, 366 N.E.2d 1279, 1289

17   (N.Y. 1977).  Second, the partial performance must entitle the

18   defendant to a benefit under the alleged contract.  See, e.g.,

19   Merrill Lynch Interfunding, 155 F.3d at 122; Club Haven

20   Investment Co., LLC v. Capital Co. of America, LLC, 160 F.

21   Supp. 2d, 590, 592 (S.D.N.Y. 2001).

22           In this case, the plaintiffs argue that the

23   defendants' $50,000 payment to Mixon is unequivocally referable

24   to the 2013 amendment.  The defendants rely on American

25   International Telephone Incorporated v. Mony Travel Services,

Inc., No. 99 Civ. 11581, 2001 WL 209918 (S.D.N.Y. February 23, 2001), and on Amresco Financial I, L.P. v. Stone-Tec, Incorporated, No. 98 Civ. 2872, 1998 WL 888987 (S.D.N.Y. December 21, 1998), to argue that the $50,000 payment is not unequivocally referable to the 2013 amendment because the defendants were already required to pay Mixon pursuant to the 2012 agreement.  The defendants' argument is unpersuasive because the defendants did not owe Mixon $50,000 or more under the 2012 agreement when the $50,000 payment was made.  Rather, at that time, the defendants owed Mixon only $37,500 under the 2012 agreement.  The defendants maintain that any excess payment is not unequivocally referable to the 2013 amendment because it was made in anticipation of payments that would later come due under the 2012 agreement.  However, the defendants have not identified in the record before the Court on this Motion to Dismiss any evidence suggesting that such anticipatory payments were intended.  Accordingly, the $50,000 payment cannot at this time in the litigation be reasonably explained without reference to the 2013 amendment and is therefore unequivocally referable to the 2013 amendment.  See cf. Merrill Lynch Interfunding, 155 F.3d at 122-23; and Anostario v. Vicinanzo, 450 N.E.2d 215, 216 (N.Y. 1983).  The plaintiffs also argue, correctly, that the defendants' use of Mixon's name and likeness in connection with the marketing and development of a New York restaurant constituted partial

E4MDDMIXC

performance unequivocally referable to the 2013 amendment.  The

defendants do not dispute that they used Mixon's name and

likeness in connection with the marketing and development of

the New York Restaurant.  Instead, the defendants contend that

such use is not unequivocally referable to the 2013 amendment

because it was authorized under the 2012 amendment.  The

defendants' argument is unpersuasive because the defendants

have not identified any provision in the 2012 agreement that

authorizes the defendants to use Mixon's name and likeness in

connection with any New York Restaurant.  Rather, the

defendants point to provisions of the 2012 agreement that

authorize them to use Mixon's name and likeness in connection

with the Miami restaurant, and that require all parties to the

2012 agreement to consult each other before attempting to open

additional restaurants affiliated with Pride and Joy.  Although

the latter provision plainly contemplates future collaboration,

it does not in any way expand the defendants' authorization to

use Mixon's name and likeness beyond the Miami restaurant.

Because the defendants only obtained authorization to use

Mixon's name and likeness in connection with the New York

restaurant through the 2013 amendment, the defendants' use of

Mixon's name and likeness in marketing the New York restaurant

is unequivocally referable to the 2013 amendment.

          Indeed, for this reason, the defendants' attempt to

characterize their conduct as preparatory activity that does

1    not satisfy the partial performance exception to Section 15-301

2    is also unpersuasive.  It is true that conduct intended to

3    facilitate the ultimate execution of a commercial agreement

4    does not constitute partial performance.  See, e.g., Merrill

5    Lynch Interfunding, 155 F.3d at 122-23; and Anostario, 450

6    N.E.2d at 216.  However, the defendants' conduct in using

7    Mixon's name and likeness appears to be more than mere

8    preparatory steps because the defendants' conduct arguably

9    involved activity that could only have been authorized by the

10   2013 amendment.  Accordingly, the defendants' conduct with

11   respect to the use of Mixon's name and likeness in connection

12   with the New York restaurant is explicable only as partial

13   performance unequivocally referable to the 2013 amendment.

14          The defendants' conduct with respect to the use of

15   Mixon's name and likeness in connection with the New York

16   restaurant also constitutes a benefit to which the defendants

17   were entitled only as a result of the 2013 amendment.

18   Therefore, the plaintiffs have sufficiently alleged partial

19   performance that is unequivocally referable to the 2013

20   amendment, and that entitled the defendants to a benefit under

21   the 2013 amendment.  As a result, the partial performance

22   exception to Section 15-301 is applicable to the plaintiffs'

23   claim for breach of the 2013 amendment and the defendants'

24   motion to dismiss claims predicated on the 2013 amendment is

25   denied.

E4MDDMIXC

1        The defendants also assert that the plaintiffs'

2  contract claims against PJNY must be dismissed in their

3  entirety because PJNY was not a party to the contracts at issue

4  in this action.

5        Ascertaining whether an entity or individual is a

6  party to a contract is initially a matter of law for the Court

7  to decide.  See, e.g., K. Bell & Associates, Inc. v. Lloyds

8  Underwriters, 97 F.3d 632, 637 (2d Cir. 1996).  However, the

9  Court should construe a contract as a matter of law only where

10  the contract is unambiguous on its face.  A contract is

11  unambiguous if it "has a definite and precise meaning,

12  unattended by danger of misconception in the purpose of the

13  contract itself, and concerning which there is no reasonable

14  basis for a difference of opinion."  Sayers v. Rochester Tow

15  Corp. Supplemental Management Pension Plan, 7 F.3d 1091, 1095

16  (2d Cir. 1993).  On the other hand, a contract is ambiguous

17  where it is "capable of more than one meaning when viewed

18  objectively by a reasonably intelligent person who has examined

19  the context of the entire integrated agreement and who is

20  cognizant of the customs, practices, usages and terminology as

21  generally understood in the particular trade or business."

22  Nowak v. Ironworkers Local 6 Pension Fund, 81 F.3d 1182, 1192

23  (2d Cir.1996).  "Where the intent of the parties is too

24  ambiguous to be gleaned from the contract alone, the Court

25  should receive evidence that might better clarify that intent."

E4MDDMIXC

DKR Capital, Inc. v. AIG International West Broadway Fund, Ltd., No. 03 Civ. 1568, 2003 WL 22283836, at 4, (S.D.N.Y. 2003).

     In this case, the plaintiffs allege that PJNY was a party to the contracts at issue on the basis of the 2013 amendment.  According to the plaintiffs, this is so because the 2013 amendment specified that the party contracting with the plaintiffs was no longer PJM, but rather an entity called Pride and Joy, LLC, which represented both PJM and PJNY.

     The defendants argue that the 2013 amendment cannot provide a basis for PJNY's liability for two reasons.  First, the defendants contend that the 2013 amendment cannot provide a basis for PJNY's liability because the 2013 amendment was a nonbinding draft agreement.  However, the Court has already concluded that it cannot find at this stage that the 2013 amendment was insufficient to bind the parties.

     Second, the defendants argue that the 2013 amendment cannot provide a basis for PJNY's liability because PJNY was not a party to the 2013 amendment.  This argument is unpersuasive.  The 2013 amendment provides that it shall "supplement [] and amend[]" the 2012 agreement.  The 2013 amendment then modifies the 2012 agreement by substituting new entities for those individuals and entities originally party to the 2012 agreement.  The 2013 amendment provides that all references to PJM are amended to reference Pride and Joy, LLC.

Accordingly, it is clear that Pride & Joy, LLC was the

contracting entity for purposes of the 2013 amendment and, if

the 2013 amendment was binding, that Pride and Joy, LLC also

replaced PJM as the contracting entity for purposes of the 2012

agreement.

          The plaintiffs allege that this substitution made PJNY

party to both the 2013 amendment and the 2012 agreement,

because the substituted entity, Pride and Joy, LLC, is an

assumed business name that encompasses both PJM and PJNY.

Although the defendants contend that this is not so, the Court

must at this stage presume that the plaintiffs' allegations are

true.  Because Pride & Joy, LLC is plainly a contracting party

to the 2013 amendment, and because the plaintiffs allege that

Pride and Joy, LLC is an assumed business name that encompasses

both PJM and PJNY, the Court cannot find that the terms of the

2013 amendment unambiguously exclude PJNY as a party to the

2013 amendment.

          Moreover, the allegations in the Amended Complaint

support the plaintiffs' contention that PJNY was a party to the

2013 amendment because PJNY's conduct was allegedly consistent

with the conduct of a party to the 2013 amendment.  For

example, PJNY marketed the restaurant using Mixon's name and

likeness, leased space for the New York restaurant, applied for

and received a liquor license for the New York restaurant, and

held a pre-opening of the New York restaurant.  Therefore, the

1    defendants' motion to dismiss the plaintiffs' breach of

2    contract claims against PJNY is denied.

3            The defendants next contend that the plaintiffs'

4    trademark infringement claim against Defendant Cardenas must be

5    dismissed because the plaintiffs have not pleaded facts

6    asserting a plausible inference that Defendant Cardenas was

7    sufficiently involved in the alleged infringement.  The

8    defendants rely on Bambu Sales v. Sultana Crackers, Inc., 683

9    F. Supp. 899, 913-914 (E.D.N.Y. 1988), and Carell v. Shubert

10   Organization, Inc., 104 F. Supp. 2d 236, 271 (S.D.N.Y. 2000),

11   to argue that the claims of trademark infringement against

12   Cardenas must be dismissed because Cardenas was not the

13   "moving, active conscious force" behind the infringement.

14           In Bambu, the court dismissed the trademark

15   infringement claims against a corporate official where the

16   record on summary judgment contained "no facts to support his

17   liability."  Similarly, in Carell, the court found that the

18   plaintiffs' allegations that various defendants occupied senior

19   positions at infringing companies, when coupled with the

20   conclusory allegation that the defendants "'participated in

21   some if not all' of the infringements," were not sufficient to

22   plead that several of the individual defendants were a moving,

23   active, conscious force behind the alleged infringement.

24           In this case, however, the plaintiffs have made more

25   substantial allegations of the individual defendants'

1    involvement in the alleged infringement.  The plaintiffs allege

2    that Cardenas was the majority owner and managing member of

3    both PJM and PJNY, and that Cardenas did not merely participate

4    in, but at all times oversaw and directed the infringement

5    alleged.  Indeed, the plaintiffs allege that Cardenas was one

6    of the individuals who initially approached Mixon about the

7    prospect of partnering on a barbeque restaurant in Miami.

8    Because these allegations support a plausible inference that

9    Cardenas was both aware of and intimately involved in the

10   trademark infringement alleged, the plaintiffs have plausibly

11   alleged that Cardenas was a conscious, active, and moving force

12   behind the alleged infringement and the defendants' motion to

13   dismiss the plaintiffs' claims against Cardenas is denied.

14           Finally, the defendants assert in a footnote that the

15   plaintiffs' claims for common law misappropriation of name and

16   likeness must be dismissed because no such cause of action

17   exists under New York law.  In the same footnote, the

18   defendants also assert that, in the event that the plaintiffs'

19   claims for common law misappropriation of name and likeness are

20   not dismissed in their entirety, the claims should be dismissed

21   against Defendant Cardenas on the grounds that the plaintiffs'

22   Amended Complaint does not contain allegations sufficient to

23   support a plausible inference that Defendant Cardenas can be

24   held personally liable for the infringement alleged.

25           These arguments will not be considered on the present

E4MDDMIXC

1    Motion to Dismiss because it is well settled that courts may

2    disregard as insufficiently presented for consideration

3    arguments raised only in a footnote.  See, e.g., Dorchester

4    Financial Services, Inc. v. Banco BRJ, S.A., No. 11 Civ. 1529,

5    2014 WL 684831, at 2 n.2 (S.D.N.Y February 21, 2014)

6    (collecting cases); cf. Paese v. Hartford Life and Accident

7    Insurance Co., 449 F.3d, 435, 446, n.3 (2d Cir. 2006),

8    (applying similar principle on appeal) and (collecting cases).

9            Accordingly, the defendants' motion to dismiss the

10   plaintiffs' claim for common law misappropriation of name and

11   likeness is denied.

12           The Court has considered all of the arguments of the

13   parties.  To the extent not specifically addressed above, they

14   are either moot or without merit.  For the foregoing reasons,

15   the defendants' motion to dismiss is denied.  The Clerk is

16   directed to close Docket Number 15.

17           So, okay.

18           There has been no answer, right, because there's a

19   motion to dismiss, right?

20           MR. MACDONALD:  Correct.

21           THE COURT:  How much time for discovery?

22           MR. MACDONALD:  I would certainly defer to the

23   plaintiffs.

24           MR. NAKAMURA:  Your Honor, I'd say four to five

25   months.

E4MDDMIXC

1          THE COURT:  How much?

2          MR. NAKAMURA:  Four to five months.

3          THE COURT:  Why so much?

4          MR. NAKAMURA:  It could be three to four months, your

5    Honor.

6          THE COURT:  Whatever.

7          MR. NAKAMURA:  I think it's realistic, four to five.

8          THE COURT:  Okay.  The time to answer the amended

9    complaint is May 2.  Complete discovery by September 5.

10         There aren't going to be any more parties or causes of

11   action, are there?

12         MR. NAKAMURA:  Not from plaintiff, your Honor, as far

13   as I know.

14         THE COURT:  So let me put in, no additional parties

15   and causes of action after May 16th.  No additional defenses

16   after May 30.  Dispositive motions, if any, by September 26.

17   Joint pretrial order by October 10.

18         Is this a jury trial?

19         MR. NAKAMURA:  Yes, your Honor.  I believe so.  I

20   think I've requested it.

21         THE COURT:  Estimated trial time is four days.  The

22   parties should be ready for trial on 48 hours' notice on and

23   after October 24th.

24         Would the parties agree to try the case before the

25   Magistrate Judge?

E4MDDMIXC

1              MR. NAKAMURA:  I'd have to consult with my client,

2      your Honor.

3              THE COURT:  That's fine.

4              Does it make any sense for me to send the case to the

5      Magistrate Judge for purposes of settlement at this point?

6              MR. NAKAMURA:  Again, I'd have to talk to my client

7      but --

8              THE COURT:  I mean, all of you are perfectly capable

9      of settling on your own.

10             Does the plaintiff have any desire to continue its

11     relationship with the defendant?

12             MR. NAKAMURA:  My understanding is no, given the

13     defendants' conduct, your Honor.

14             THE COURT:  So, one would think that the plaintiff

15     should make a demand, right, and then the defendant can

16     respond?  There are things that are just up in the air, life,

17     suspension of payments.

18             Okay.  Well, no one is rushing to tell me that they

19     think the case is ripe for the Magistrate Judge for purposes of

20     settlement, but what I'll do is I'll just ask you, if you

21     would, to let me know by May 16 whether the parties agree to

22     trial before the Magistrate Judge, and whether a reference to

23     the Magistrate Judge for purposes of settlement would be

24     useful.

25             You can just send me a joint letter, I don't have to

E4MDDMIXC

1   know who wants to go to the Magistrate Judge and who doesn't.

2   Okay?

3               MR. NAKAMURA:  Yes.

4               THE COURT:  Anything else?

5               MR. NAKAMURA:  No, your Honor.

6               MR. MACDONALD:  No, your Honor.  Thank you.

7               THE COURT:  Good to see you all.

8               MR. NAKAMURA:  Thank you, your Honor.

9               MR. MACDONALD:  Thank you, your Honor.

10              (Adjourned )

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25